## Piersall's Administrator v. Chesapeake & Ohio Railway Company, et al.

## Black's Administrator v. Chesapeake & Ohio Railway Company, et al.

(Decided May 24, 1918.)

## Appeals from Clarke Circuit Court.

1. Negligence—Actionable Negligence—Question for Court.—Where, in an action to recover damages because of alleged negligence, there is no contradiction as to the facts, as to whether or not there is actionable negligence, is a question for the court.

2. Negligence—Actionable Negligence Defined.—Actionable negligence arises from a failure to perform a duty, which one owes to another, and where there is no failure to perform a duty, there is no actionable negligence.

3. Railroads—Crossings—Reciprocal Duties.—At a public crossing, a railroad company and the person using the crossing have a mutual and reciprocal duty of exercising care to avoid giving or receiving injury, and where the crossing is dangerous, an increased duty devolves upon each one of them, in proportion to the increase of the danger.

4. Railroads—Crossings—Signals.—The customary and statutory signals, as a rule, are considered a reasonably sufficient warning of the approach of a train to an ordinary crossing in the country, when a sufficient lookout is, also, maintained.

5. Railroads—Crossings—Warnings.—A railroad company is not negligent because of failure to moderate the speed of a train at an ordinary crossing, in the country, but, if the speed is great, care must be exercised to give warnings of its approach, commensurate with the danger.

PENDLETON & BUSH, B. R. JOUETT and FRANKLIN & TALBOTT for appellants.

J. M. BENTON and SHELBY, NORTHCUTT & SHELBY for appellees.

Opinion of the Court by Judge Hurt—Affirming in each case.

William Piersall and Phillip Black were traveling from Lexington, in the direction of Winchester, in an automobile, which was owned and being driven by Black. At a public crossing of the track of the Chesapeake & Ohio Railway Company, over the pike, upon which they were traveling, at Pine Grove, the automobile and a fast train, of the railway company, collided and caused the deaths of both of the occupants of the automobile. An action was instituted by the administrator of each of the decedents against the railroad company and its engineer and fireman, who were operating the train, to recover, from them, the damages sustained by each of their estates, because of their deaths. The contention of the administrators of the deceased parties is, that the ones, who were operating the train, negligently ran the train against the automobile, as it was crossing over the track of the railroad, and thus caused the death of the occupants, while the railroad company denies, that there was any negligence in the operation of the train or that the train was run against the automobile, but, upon the other hand, that the deaths, of the occupants, were caused by their negligently running the automobile against the train, as it was passing over the crossing, or at least, that they failed to exercise ordinary care for their own safety in attempting to cross the track at the time, and that such negligence so contributed to their deaths, that, but for it, they would not have suffered any injury. The charges of negligence against the decedents were denied by the administrators. The evidence applying to each of the actions being to a large extent necessarily the same, they were heard together in the circuit court, and at the conclusion of all the evidence, which was offered by the plaintiffs, the court sustained a motion to direct the jury to find a verdict for the defendants, in each action, and rendered a judgment denying the relief sought and dismissing the petition in each case. From the judgment, in each action, the plaintiff has appealed and seeks a reversal upon the ground that the court erred in peremptorily directing the jury to find a verdict for the defendants. The particular ground upon which the court based its action in directing the verdict, as it did, does not from the record appear, hence, it will be first considered whether the evi-

dence heard tended to prove any actionable negligence upon the part of the defendants, which was the proximate cause of the deaths of the decedents, or in other words whether there was any issue made, in the evidence, of negligence on the part of the defendants, which necessitated the submission of the issue to the jury, for if there was no contradiction as to the facts, the question as to whether or not there was actionable negligence was a question of law for the court. L. & P. Canal Co. v. Murphy, 9 Bush 533; Dolfinger v. Fishback, 12 Bush 478; L. & N. R. R. Co. v. Raines, 15 R. 423; L. & N. R. Co v Breeden, 13 R. 397.

The Pine Grove station or depot is a building, which is situated upon the north side of the railroad track and about fifteen feet from the middle of it. In front of the building, and within a foot or two of it, there is erected an iron post about four inches in diameter, which is called a signal tower. Upon the south side of the track, and about the same distance from it, as the depot building, is a house used for a warehouse. Directly north of the depot building and about nineteen or twenty feet from it is a small store house, and two or three hundred feet east of the store house, but somewhat closer to the track, is a small outhouse of some character or other. The railroad track, at this point, is a line from Winchester to Lexington and follows a course, which is from the east to the west, and for a distance of about ten miles to the east and to the west of the station, though how far either way the evidence does not disclose, the track is substantially a straight line and has a slight ascending grade from about 2,500 feet east of the station to about 900 feet east of the station, from which point it has a descending grade of approximately eight-tenths of one per centum, to a point, which is two or more thousands of feet to the westward of the station. Coming from the east, the track passes through a cut, which, at a point 900 feet to the east of the station, is about twenty feet in depth and decreases in depth until 500 or 600 feet of the station, where it is only five or six feet in depth and disappears before arriving at the station. It does not appear, that a train is hidden from view, by the cut, in any place within three hundred yards of the station, when viewed from any point in the neighborhood of the station, and from the crossing a train may be seen approaching the station from the east for a mile

or two. A whistling post for the station is erected 2,570 feet east of the station. The pike, which the decedents were traveling from Lexington, approaches the crossing from a direction slightly north of west, but when it arrives within sixty or seventy feet of the crossing, the pike curves sharply to the southward and passes over the railroad track at the grade, at right angles to the track and immediately to the west of the depot and the warehouse, which is on the opposite side of the track from the depot. Near the pike to the north and south of the crossing and near to another pike, which intersects the one above described to the north of the crossing, there reside about one dozen families, within probably a quarter of a mile of the crossing. There are two store houses within the same radius, one to the north and the other to the south of the crossing, but at what distances from it does not appear. The pike, as it approaches the crossing from the north, has an ascending grade of three feet in one hundred feet, from about two hundred and fifty feet to the northward, up to the crossing. From a point upon the track, one hundred feet to the north of the crossing and probably further, a person, in an automobile approaching the crossing from the northward, can see a train approaching the crossing from the east, at a point five hundred feet to the east of the crossing, and his view of an approaching train is not obscured, in any way, until he arrives at a point fifty-seven feet from the track, when his view, of a train approaching from the east, is cut off by the depot building for a distance of forty-two feet and until he passes the depot and is fifteen feet from the track, when he can see such a train, at a point nine hundred feet or further to the east of the crossing, and when upon the crossing or within a few feet of it, can see an approaching train upon the track for a mile or more. Four eye-witnesses of the tragedy testified upon the trial. Two of them were the engineer and fireman, in charge of the train, and the other two were persons, who resided beside the pike along which the decedents approached the crossing, and at a point about eighty-five steps, of three feet each, or two hundred and fifty-five feet to the west of the crossing, and who were, at the time, in plain view of the crossing over the railroad track, as well as the pike, from the place where they were to the crossing. They both testified to having heard the steam whistle of the ap-

proaching train give a long signal, when at the whistling post to the east of the station, and, just at that time, the decedents passed them in the automobile and traveling at a rate of fifteen to twenty miles per hour. The automobile continued on toward the crossing and one of these parties testified that it made no check in its speed, until it collided with the train, but the other said, that when it began to go around the curve in the pike, seventy or eighty feet from the crossing, its speed seemed to slightly decrease, and as it was passing around the curve at a distance of from about forty to sixty feet from the crossing, they heard the whistle of the approaching train sounding the signals for the crossing. One said four and the other that three signals were given by the whistle and the last one was given when the engine was about eighty feet from the crossing. The automobile did not stop nor make any check in its movemnets, except as stated, but went forward and at the crossing, it and the train, as the witness described it, "met."

Neither, of the occupants of the automobile, was seen by these witnesses, to do anything, which indicated that they were taking any precautions to learn of the approach of the train or to keep out of its way. The engineer and fireman were offered by the plaintiffs, as witnesses for them, and testified, that, at about three hundred and fifty yards east of the crossing, the signal for the crossing was given by the whistle and three others between that point and the crossing, and the fireman testified that the whistle was sounded practically all the way from the whistling post to the crossing. Two other witnesses, who lived, as one testified, three-fourths of a mile away, and the other said one and one-half miles away, although both lived at the same house, but neither of whom saw the train, at the time, testified to having heard the signals given by the whistle, in quick succession, when the train neared Pine Grove station. The engineer and fireman testified, that the bell was continuously rung from the time the first signal by the whistle was given, until the crossing was reached. The fireman saw the automobile approaching when the train was about forty feet away and immediately the emergency brakes were applied and everything done which was possible to avoid injuring the automobile or its occupants. The automobile struck the pilot of the engine, upon its side, at the point where it joins the engine,

making a scar upon the end of the sill and tearing out two or three of the short bars, which were upon that side of the pilot and near to the engine. The front wheel of the automobile, upon the east side, was torn to pieces, but the one upon the opposite side was uninjured. The machine was thrown out upon the side of the track upon which it was approaching, and the bodies of the two occupants were found upon that side of the railroad track about thirty feet westward of the point of the collision. The train was running from forty-five to fifty miles per hour and it was stopped, according to the testimony of the engineer and fireman, at about three hundred and fifty yards west of the crossing, but according to other witnesses, about twice that distance from the crossing. Both, engineer and fireman, testified, that they were maintaining a lookout while approaching the crossing, but the engineer, on account of the proximity of the approach of the automobile, could not see it from the side of the engine, which he occupied, but the fireman testified, that the automobile approached and struck the pilot of the engine, as heretofore described. A witness testified, that a few minutes after the collision, the engineer stated, that the train was running at the rate of sixty miles per hour, but this statement was denied by the engineer.

It is a well established doctrine, that actionable negligence arises from a failure to perform a duty, which one owes to another, and where there is no failure to perform a duty, there is no actionable negligence. Hence, it must be considered, under the facts, what the duties were, which the ones operating the train, in the instant case, owed to the decedents, at the time and place, at which, they lost their lives. The duties of a railroad company, when one of its trains is approaching a public crossing is broadly and correctly stated to be, to give such warnings of the approach of the train and to take such precautions to avoid injury to persons using the crossing, as are commensurate with the danger of the particular crossing. This does not, however, mean that the means of warning employed shall be effective, so as to amount to a guarantee of the safety of persons using the crossing, but the means should be such as an ordinarily prudent person would adopt in the operation of a railroad train at the particular crossing. C. & O. Ry. Co. v. Gunter, 21 R. 1803; Cin., etc. R. Co. v. Champ, 31

R. 1054. If the crossing is exceptionally dangerous, on account of the contour of the surface of the ground or on account of obstructions, which obstruct the view or hearing, in an exceptional way, and which render the usual and statutory signals of the approach of a train inadequate for the protection of travelers upon the crossing, a greater degree of care devolves upon both the railroad and the traveler in approaching the crossing, in accordance with the increased danger, and it is to be considered in determining whether or not there was negligence in the operation of the train, which causes an injury, and, also, as to whether or not there was contributory negligence, as the railroad company and the traveler have a mutual and reciprocal duty of keeping a lookout to avoid giving or receiving injury, and it has been held, that where the facts justified, it was proper to submit to the jury the question, whether the railroad, in the exercise of proper care, should keep a flagman at the crossing or adopt some other precautions to protect the public. L. C. & St. L. R. R. Co. v. Goetz, 79 Ky. 449; Southern Ry. Co. v. Barbour, 21 R. 226; N. M. & M. V. Co. v. Stewart, 99 Ky. 496; L. & N. R. R. Co. v. Cummin's Admr., 23 R. 681; C. & O. Ry. Co. v. Riddle, 24 R. 1687; Louisville, etc. Ry. Co. v. Lucas, 30 R. 359, 539; L. & N. R. R. Co. v. Breeden, 111 Ky. 729; Railroad Company v. Clark, 105 Ky. 571; 2 Thompson on Negligence, section 1507, et seq.; Railroad Company v. Gunter, 108 Ky. 362; Ky. T. & T. Co. v. Wilson, 165 Ky. 122.

Section 768, Ky. Stats. provides, that when a train is approaching a crossing, over a highway, outside of an incorporated city or town, where the railroad crosses the highway upon the same level, the steam whistle must be sounded or the bell must be rung at a point fifty rods from the crossing, and then the whistle must be sounded or bell rung continuously or alternately, until the engine reaches the crossing. Signals required by the foregoing statute have been held and are considered as a reasonably sufficient warning to travelers of the approach of a train to an ordinary public crossing in the country, which is not an exceptionally dangerous one, and when given by the railroad company, at the approach of a train to such a crossing, they are considered to be a sufficient exercise of care for the safety of persons using the crossing, when they are attended by an adequate

lookout. Ky. T. & T. Co. v. Wilson, *supra;* L. C. & St. L. R. Co. v. Goetz, *supra*; L. & N. R. R. Co. v. Molloy, 122 Ky. 119; Parkerson v. L. & N. R. R. Co., 25 R. 2260. As was said in the case of L. C. & St. L. R. Co. v. Goetz, *supra*, which was one involving the death of decedent by being struck by a train at a public crossing in the country:

"And the exemption of appellant (railroad company) from all liability in the event it gave the proper warning of the approach of its trains, and the killing or injury was unavoidable."

This doctrine arises from the fact, that although the railroad company and the traveler, each, have a right to the use of the crossing, the railroad company has the right of way, and, from the reciprocal duty of the traveler to use such care as an ordinarily prudent man would use, under similar circumstances, to learn of the approach of the train and to keep out of its way.

In the instant case, there is no contradiction of the fact as proven, that a lookout was maintained by the engineer and fireman. It is substantially proven and not contradicted, that the first signal for the crossing was given, when the train was at least fifty rods from the crossing, by sounding the whistle. It was blown several times after that and before the train reached the crossing. Davis and wife, though, nearly, if not quite a mile away to the east, heard it. The two Esteses, who were west of the crossing, heard it, one of them saying that it sounded four distinct whistles and the other three. The engineer and fireman testified that the automatic bell on the engine was started ringing, at the time the first whistle was blown for the crossing and continued to ring continuously until after the crossing was reached by the engine. There is no contradiction of this testimony by anything, which would amount to evidence.

The appellants, however, contend, that, it having been proved, that the speed of the train was forty-five to fifty miles per hour, that was evidence of negligence on the part of the defendants, as the crossing was a place, at which the presence of persons was to be anticipated, and that, at such place, it was the duty of the railroad company to moderate the speed of the trains and to approach the crossing with the train under control, so that it could be stopped, if, any one was dis-

covered to be in danger, and for the further reason, that the crossing being an exceptionally dangerous one, that the railroad company owed the duty of placing a flagman at the crossing, or to at least reduce the speed of its train in passing, and for these reasons they were entitled to have their cause submitted to the jury upon the question, as to whether or not under all the circumstances the speed of the train constituted negligence on the part of the appellees. These contentions, however, we do not think are tenable. The places, where the failure to moderate the speed of trains amounts to negligence, are, where trains are operated through the streets of towns and cities and populous communities and where the density of the population renders it probable that persons will, at all times, be upon the streets and upon the crossings, and therefore their presence is to be anticipated. There are other places, and, under exceptional circumstances, where the ones operating trains are required to anticipate persons upon the tracks and at such places and under the special circumstances the speed of the train must be moderated, but the general rule, and where there are no exceptional circumstances, is as stated in L. & N. R. R. v. Molloy's Admr., 122 Ky. 219, where it is said:

"The rule, that the speed of trains must be moderated, applies to cities and towns where the population is dense and the presence of persons may be anticipated, on the track at crossings, but it does not apply to highway crossings in the country. . . . The rule is that at ordinary crossings in the country no rate of speed is negligence, but that, where the speed of the train is great, care in giving warning of the approach of the train commensurate with the danger must be observed."

The case of C., St. & N. O. Ry. Co. v. Armstrong's Admr., 168 Ky. 10, does not sustain a contrary doctrine, as the scene of the accident, in that case, was a suburb of the considerable city of Paducah, and one hundred and twenty-five families resided in close proximity to the crossing, which made it substantially a city crossing and besides, in that case the evidence was contradictory as to the warnings of the approach of the train having been given.

The facts, in the instant case, do not show, that the crossing is more than an ordinary one, and no facts

are presented, which would bring it within the rule applicable to an exceptionally dangerous one, as there is nothing to prevent hearing the warning signals of an approaching train, and nothing to obscure a sight of the train approaching, except for the space of forty feet, the depot obscures the sight of a train coming from the east, from one approaching the track from the north, but the train may be seen by one so approaching the crossing, for a very considerable distance before the depot is reached, and after passing the depot it may be seen for three hundred yards before it reaches the crossing and before the traveler reaches the track. The contour of the ground does not obscure the sight of the train anywhere in proximity to the crossing. Hence, the rule which applies to an ordinary country crossing must be applied to the facts of this case, and the speed of the train can not be considered as negilgence. As the uncontradicted evidence proves that the customary and statutory warnings of the approach of the train were given, and that the peril of the decedents was not discovered until it was impossible for the train crew to avoid the collision, the plaintiffs failed to show any negligence upon the part of the defendants and their actions necessarily fail.

Hence, it is unnecessary to discuss the effect of the evidence tending to prove that the death of the occupants of the automobile arose entirely from their own negligence or their contributory negligence, and the judgments are therefore affirmed.

Whole court sitting.